THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD TROY PHILLIPS, Defendant-Appellant.

First District (5th Division)   No. 85—2050

Opinion filed July 31, 1987.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kenneth T. McCurry, and Paul A. Tanzillo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and was sentenced to a term of imprisonment for 38 years. He appeals urging the following: (1) his right to due process was violated by the denial of his request that the jury be instructed that it might convict him of voluntary manslaughter if it found he acted under a sudden and intense passion resulting from serious provocation; (2) his right to due process and the right to a trial by jury were denied when the trial court refused to require the jury to return a verdict as to the offense of voluntary manslaughter; (3) he was denied effective assistance of counsel; (4) the trial court abused its discretion in admitting a photograph of the deceased which depicted a surgical incision; (5) he was prejudiced and denied a fair trial by the prosecutorial comments during closing argument; and (6) the trial court abused its discretion in imposing a term of imprisonment of 38 years for murder.

We reverse and remand.

Testimony at the trial established the following. On February 27, 1984, the defendant, who worked in a kitchen at Northwestern Memorial Hospital, had an argument with his supervisor, Donald Roberts, at work. It is undisputed that defendant believed Roberts had been unfairly harassing him about his work performance. The following day the defendant did not go to work because he was "still angry" at his supervisor, and when defendant returned on February 29, 1984, he was assigned to work in the dishroom. He changed into his white kitchen uniform and took a pair of rubber gloves to the dishroom. He noticed Roberts sitting in his office while on his way to the cafeteria to eat. The outer wall of the office was glass from about three feet to the top. Before reaching the dishroom, the defendant stopped into the salad room to see a co-worker. However, the co-worker had not yet arrived. While in the salad room, the defendant saw a knife on top of a table which he put into his pants, concealing the knife from view. He then went to Roberts' office.

Before entering the office, defendant placed the knife over his shirt so Roberts would see it. Roberts was on the telephone. Freda Garray, a supervisor at Northwestern Hospital, testified that at about 6:30 a.m. on February 29, 1984, she received a call from Roberts asking for help for his shift. As they were talking, Roberts told her to hold on but he did not push the hold button. She then heard Roberts

say, "Oh, my God. No." Another witness, Irma Powers, who was in the office across the hall from Roberts, also saw defendant enter the office while Roberts was on the telephone. She saw the defendant hitting Roberts in the chest with something. Another witness, Zephyr Woods, was working four to five feet away from the office when she heard a lot of screams. She turned around and saw defendant in the office with a blade in his raised hand. Another witness, Beatrice Asa-Atiemosh, was working in the kitchen area when she heard shouting. As she got closer to Roberts' office, she saw the defendant standing over the victim making a stabbing motion. Roberts had blood on his face while he was on the floor trying to get up. Dr. John Ruge, who was on his way to the kitchen area, also heard people screaming. He approached Roberts' office, where he saw defendant with a knife in his hand and his hand raised and Roberts was slumped over the desk.

About 6:40 a.m. security guards Ron Gann and James Gray received a radio message of a man with a knife in the Passavant kitchen. As Gann approached the office he saw blood on the walls and Roberts "crumpled on the floor." Both of them saw the defendant with a knife in his hand and saw him come down with a knife and stab the victim in the lower right portion of his back. Gann then opened the office door and yelled to the defendant in order to divert his attention away from Roberts. After opening the door he saw blood on the desk, the walls, and on Roberts. As Gann entered the office the defendant stepped over Roberts and started towards the door with the knife in his hand. As he approached Gann, Gann put his arms up and backed out the doorway, trying to give the defendant a path to walk out.

About this time, security guards Doughty and Luke, who had also heard the radio broadcast of a man with a knife in the kitchen, arrived at Roberts' office. When they arrived they saw the defendant coming out of the office with a knife in his hand and blood on his uniform. As they approached the defendant, the defendant told Doughty to "get the f— out of the way or I'll do the same thing to you as I did to him," and "They're not going to f— with me no more." At this point, Doughty stepped back to let defendant out.

As he left the office defendant passed the security guards, went out of the kitchen area, out of the hospital and on to the street. He was pursued by security guards Gann, Doughty and Luke. Once on the street Luke took out his pistol and ordered the defendant to halt and to drop his knife. Defendant was handcuffed and taken into custody. At this time, Luke noticed that the defendant was wearing two rubber gloves covered with blood.

After taking possession of the knife, the guards took the defendant to the hospital security office. Defendant was then advised of his *Miranda* rights and indicated that he understood them. He told Gann and Luke that "they kept harassing me everyday" and "they kept making fun of me." The defendant was then transported to Area Six Violent Crimes, where he was interviewed by police detectives Villardita and Whalen and again advised of his *Miranda* rights before he was questioned. Defendant again indicated he understood his rights. He then told the detectives what happened in a narrative form, and this interview lasted about 15 or 20 minutes.

At about 1 p.m. Assistant State's Attorney Lawrence Lykowski arrived at Area Six and interviewed the defendant in the presence of Villardita. Defendant was again advised of his *Miranda* rights before speaking to Lykowski and again said he understood his rights. He also was presented a form containing the *Miranda* rights and was asked to sign this form if he understood his rights. Defendant read those rights out loud and signed the form. Defendant then told Lykowski and Villardita in narrative form what happened that morning in the hospital. Villardita testified that the defendant told Lykowski the same story as he told earlier to Detective Whalen and himself. This interview lasted about 45 minutes.

At about 4 p.m., Lykowski and Villardita returned to the interview room and again spoke to the defendant. He was again advised of his rights and indicated he understood them. Lykowski then told the defendant that he wanted to reduce the defendant's statement about the incident to writing and that he would write down everything the defendant said and that when the defendant was finished talking, he would give the defendant the written statement so that he could make any necessary changes, after which he would be asked to sign the statement. Defendant agreed and again told Lykowski and Villardita what happened. He told them that on Monday he and Roberts had an argument, that he went home angry and on Tuesday he was still under pressure and called in sick, that after arriving at work on Wednesday and changing into his uniform, he walked through the kitchen and saw Roberts sitting at his desk, that when he saw Roberts he again became upset and he walked into the kitchen, got a butcher knife, and put the knife into the waistband of his trousers. Initially he covered the knife with his shirt so that it was concealed and he had gloves on his hands. He then went into Roberts' office and closed the door. He asked Roberts why he was being hassled and Roberts told him to go do his work. Roberts did not have anything in his hands and before he knew it, he drew the knife and as the two

scuffled, he killed Roberts. He looked up and everybody was around him. He still had the knife and panicked. He ran out of the building. A security guard followed him and arrested him on the street. They then told him Roberts was dead. After writing down the statement, Lykowski gave the written statement to defendant for him to read and make any corrections and after he read his statement aloud three times he made changes on each of the three pages and then signed the statement along with Lykowski and Villardita.

Dr. Donoghue, deputy chief medical examiner of Cook County, testified that he supervised the postmortem examination of the victim and found 14 stab wounds, four of which would have caused Roberts' death. He also testified that he found defensive wounds on Roberts' hands.

At the close of the prosecution's case in chief, the defendant's bloody uniform, the knife, one of the rubber gloves, various photographs of Roberts and his office, and the written statement signed by defendant were admitted into evidence.

The defendant then testified on his own behalf. His testimony contradicted much of the evidence presented by the State, including his signed statement. He testified that before entering Roberts' office, he placed his shirt behind the knife so Roberts would see it. He wanted to frighten Roberts into listening to him. Roberts was at his desk going over the work schedule. Defendant asked him why he was being constantly harassed and said he wanted to reach a compromise. Roberts said "Nigger, go do your work." Roberts snatched the knife from defendant's waistband and swung it at his face twice in a horizontal motion, nicking him on the left wrist. Roberts called him a "nigger" and said he would kill him. The second time defendant caught Roberts by the wrist and raised his hand away from his face. Roberts had defendant pinned against the glass window so defendant kicked him once or twice in the groin. When the knife flipped out of Roberts' hand on the floor, defendant went for the knife and Roberts kicked him in the chest. Roberts grabbed his collar with his right hand and tried to get the knife from him with his left. Defendant tried to jerk away. He was in a state of panic and stabbed Roberts once or twice. Roberts still had his collar and was still persistent, at which point the stabbing got out of control. Defendant did not recall how many times he stabbed Roberts. Roberts collapsed on the desk and then on the floor. Defendant was also cut on the knee during the scuffle. After leaving the office, the defendant was stopped and taken into custody. He told the security guards he was being harassed. He was then taken to the police station, where he talked to police officers

and the State's Attorney. Defendant stated, however, that when he talked to the officers and the State's Attorney he did not go into full detail about the incident. He said he was allowed to read the statement, but did not read it thoroughly and just glanced through it.

On cross-examination the defendant admitted that he was upset when he got the knife and that he put the rubber gloves on. He also admitted that he initially concealed the knife but then uncovered it before entering the office. He denied that the victim was on the telephone when he went into the office. Defendant also testified that he did not say anything to any of the security guards when he was leaving the office.

Following closing arguments the trial judge instructed the jury on the theories of self-defense and voluntary manslaughter—unreasonable belief of self-defense, but refused instructions on voluntary manslaughter—provocation and refused separate verdict forms of guilty and not guilty for murder and voluntary manslaughter. The jury found the defendant guilty of murder.

At post-trial motions defense counsel unsuccessfully attempted to present the testimony of another Northwestern employee who, she represented, saw the knife in Roberts' hand. She had attempted to subpoena him but was told by her investigators that he no longer lived at the address shown on the subpoena, which information she later learned was untrue. After a hearing in aggravation and mitigation defendant was sentenced to 38 years for murder to the Illinois Department of Corrections.

OPINION

█ Initially defendant contends that the denial of his request for a jury instruction on the sudden and intense passion form of voluntary manslaughter was violative of his due process guarantees. Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) provides in relevant part:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under sudden and intense passion resulting from serious provocation by:

(1) The individual killed, ***."

Mutual quarrel or combat is among the recognized forms of serious provocation. (*People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782.) Where there is some evidence of these facts in the record which, if believed by a jury, would reduce the crime to manslaughter, then a tendered manslaughter instruction must be given. *People*

*v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358.

At trial, defendant relied on his own testimony to provide the necessary evidentiary basis for the instruction. Although it was the State's theory that defendant stabbed Roberts without provocation and had gone into his office with the intent of stabbing him, defendant testified that he armed himself with the knife only for the purpose of frightening Roberts so he would quit harassing him with no intent of using it. Furthermore, defendant testified that Roberts grabbed the knife from defendant's waistband and that Roberts attempted to stab him. An issue of fact exists as to whether defendant was provoked, an issue which should have been resolved by the jury on proper instructions. See *People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358.

The mere fact that defendant had the knife upon his person while Roberts was not so armed is not alone sufficient to preclude the possibility of mitigation. The question is whether or not defendant entered the combat with the intention of using the knife. (See R. Perkins & R. Boyce, Criminal Law ch. 2, at 90 (3d ed. 1982).) A vital distinction needs to be recognized between a slayer who procured a knife beforehand for the purpose of killing and the sudden use, in the heat of combat, of a knife which the slayer merely happened to have at the moment. (R. Perkins & R. Boyce, Criminal Law ch. 2, at 90 (3d ed. 1982).) Here, defendant testified that he did not enter Roberts' office with the knife for the purpose in mind of attacking Roberts. He testified that he merely wanted to frighten Roberts into listening to his problems. As such, his testimony indicates that the use of the knife was not intended.

In *People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358, there was evidence that defendant entered his place of previous employment in a threatening manner. There was also evidence that defendant suffered a lacerated lip and that decedent suffered lacerations to the head and right hand. The circumstances under which these injuries arose were not disclosed by the evidence at trial. Subsequent to the circumstances which produced these injuries, defendant and decedent were engaged in a struggle over a weapon. The supreme court held that the trial court should have tendered an instruction on the lesser included offense of voluntary manslaughter and therefore remanded the case for a new trial.

■ Similarly, the trial court in the case at bar should have tendered such an instruction. Even though defendant entered Roberts' office with a knife upon his person, his testimony was that he did not intend to use it. Rather he intended that Roberts be persuaded to stop harassing him. According to defendant, Roberts suddenly

grabbed the knife from his waistband and attacked him with it. Defendant contended that only after Roberts' actions and the ensuing struggle was he provoked into stabbing Roberts. Defendant was entitled to have the jury resolve the conflicting testimony on proper instructions.

Defendant also contends that certain prosecutorial comments during closing argument denied him a fair trial. We find no likelihood that these statements will reoccur and therefore will not address the issue. We also do not reach defendant's ineffective assistance of counsel argument due to our determination to remand the case on other grounds.

■ We will, however, address those issues which may arise on remand. Defendant contends that his right to due process was denied when the trial court refused to require the jury to return a verdict as to the offense of voluntary manslaughter. The prosecution in return maintains that the defendant cannot raise this contention for the first time on appeal where he did not object to the forms of verdict he submitted to the jury at trial or in his post-trial motion. In instructions conference defense counsel asked that, rather than being given a general not guilty form, the jury be given separate not guilty verdict forms for both murder and voluntary manslaughter. We recognize that to date case law appears to suggest that the procedure followed below· was not erroneous. (*People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 446; see also O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209 (1986).) Nonetheless, the better practice would have been to require a finding on each verdict. See *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.

■ Defendant next contends that the trial court abused its discretion in admitting a photograph of the deceased which depicted a surgical incision. If the probative value of a photograph is outweighed by its prejudicial effect, it should be excluded. (*People v. Coleman* (1983), 116 Ill. App. 3d 28, 451 N.E.2d 973.) Here the photograph was submitted to the jury in error as it had no recognizable probative value.

■ The final contention of defendant is that the trial court abused its discretion in imposition of a term of imprisonment of 38 years on defendant. However, the imposition of a sentence is a matter of judicial discretion and absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Given the evidence presented, the trial court, in the case at bar, did not abuse its discretion.

For the foregoing reasons the judgment of the circuit court is reversed and remanded for a new trial.

Reversed and remanded for a new trial.

PINCHAM and MURRAY, JJ., concur.