# Illinois Official Reports

## Appellate Court

***People v. Randall*, 2016 IL App (1st) 143371**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRELL RANDALL, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3371 |
| Filed | September 30, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-15388; the Hon. John Joseph Hynes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Benjamin A. Wolowski, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Hall and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Terrell Randall was convicted of the first degree murder of Tonnisha Johnson. The jury also found that defendant personally discharged the firearm that caused Johnson's death. The trial court sentenced defendant to a total of 90 years in the Illinois Department of Corrections (IDOC). On this appeal, defendant argues (1) that the trial court erred by refusing to instruct the jury on second degree murder where there was some evidence tending to show that defendant was acting under a serious provocation; (2) that defendant was denied effective assistance of counsel where his trial counsel opened the door to the introduction of other crimes evidence; and (3) that, in sentencing defendant to 90 years in prison for first degree murder, the trial court improperly relied upon an aggravating factor inherent in the offense, and thus defendant should receive a new sentencing hearing. For the following reasons, we affirm.

¶ 2                                  BACKGROUND

¶ 3    The following facts were adduced at trial.[1]

¶ 4    Tonia Worthen testified that she was the mother of the victim, Tonnisha Johnson, who was 28 years old in August of 2011. Worthen was living in Minnesota in 2011, while Johnson was living in Chicago. Mother and daughter talked on the phone every two or three days, including in the evening hours of August 26, 2011. Johnson was speaking to her mother on a speaker phone, when Johnson told her mother she was with her friend Terrell, and a male voice said "my name is Terrell Randall." Worthen had never spoken to defendant before and had never heard of him at the time. At the end of the phone conversation, Johnson asked her mother to call her back in 45 minutes at the same number, but Worthen did not have the opportunity to call back.

¶ 5    Worthen testified that she received another call from her daughter that same night around 1:30 a.m. Johnson said: "Mom, I am shot, mom. I can't breathe, mom." Then Johnson hung up the phone and Worthen tried to call her back, but Johnson did not answer. Worthen reported the incident to the police, drove to Chicago, and went to Christ Hospital. When she arrived there, Worthen observed her daughter lying in a bed with IVs in her arms and tubes in her neck and mouth. Johnson was alive but unable to speak. Johnson died on September 6, 2011.

¶ 6    Amy Cartage testified that she was 22 years old at the time of the trial and had two children. She met defendant in February 2009, when she was 17 years old, and they began dating. Cartage and defendant split up the same year, and Cartage began to date a man named Kevin Newsome in July 2010. Defendant reconnected with Cartage in May 2011, at which time Cartage was pregnant with Newsome's child. At that time, defendant asked if he could date Cartage again, and she said no, although she said that they could be friends. Cartage gave birth to her first child in July 2011. After giving birth, Cartage discovered that Newsome was cheating on her, at which point her communication with defendant increased.

¶ 7    Cartage testified that she was spending the night at Newsome's house on the night of August 25 into August 26, 2011. That night, Newsome changed the voicemail on Cartage's phone to state, in his voice, "Hi. You have reached Mr. and Mrs. Newsome. Please leave a

---

[1]This appeal concerned only the death of Tonnisha Johnson.

message." Cartage had a Cricket phone, for which she could pay by the day. This phone expired around midnight. Even though it was disconnected, Cartage could still receive voicemails.

¶ 8    Cartage testified that she fell asleep at Newsome's house that night. She woke up around 4:00 a.m. to find that Newsome was not there with her, and she went outside to look for him. Cartage found Newsome asleep in a vehicle outside with another woman named Charmaine, who was in the driver's seat. Cartage knocked on the window of the vehicle and told Newsome to exit the vehicle. After Newsome exited, Charmaine drove away. Cartage and Newsome stood on the porch of Newsome's house and discussed how to fix their relationship.

¶ 9    During the conversation on Newsome's porch, Cartage turned and observed defendant walking toward her from the driveway. Defendant had a gun pointed at them. Cartage stepped down, put her arms out and said "no." When Cartage said "no," defendant pulled the trigger. Cartage observed the flash of the gun, heard the gunshot, felt a burning sensation in her stomach and fell. She realized she had been shot when she looked down and observed blood. Then defendant shot Newsome, walked away, and drove off in his 1999 goldish-brown Malibu.

¶ 10    Cartage testified that an ambulance transported her to Christ Hospital, where she underwent surgery. Later on the same day, Cartage realized she had two voicemails from defendant. Cartage had not listened to these messages before being shot. At trial, Cartage identified defendant's voice on one of the voicemails, which was admitted in evidence and played in court before the jury.[2] In the voicemail, defendant sounds angry that Newsome's voice is on Cartage's voicemail, and he states, "you're going to play me like that." On the voicemail, defendant calls Cartage names and threatens her. He says he is on the run from the police, but he is going to find her first. He ended the message by stating, "one of you all dying tonight."

¶ 11    Cartage testified that she received a phone call from defendant on September 11, 2011. The call was recorded and also admitted into evidence and played for the jury.[3] In the call, Cartage tells defendant she still loves him but begs him repeatedly to tell her why he shot her and why he shot Johnson. Defendant replies, "man, I don't even know." In the call, Cartage asks defendant what Johnson did to cause him to shoot her. He does not reply. During the call, defendant attempts to persuade Cartage to not testify against him. She replies that defendant shot her and she loves him, but she is going to testify. On cross-examination, Cartage testified that at some point defendant told her that he was drugged during the shootings.

¶ 12    Michael Narish, a crime scene investigator for the Illinois State Police, testified that he processed the crime scene of the Johnson shooting on August 26, 2011. The crime scene was located on the east side of Cicero Avenue, just north of 154th Street in a parking lot. He received a call asking him to come to the scene at 2:30 a.m., and he arrived at 3:20 a.m. Upon his arrival, he was informed that the Oak Forest police had arrived to find a woman shot two times, and the paramedics transported her to Christ Hospital. At the crime scene, he observed a

---

[2]A disc containing this voicemail is in the record. At trial, the parties stipulated to the accuracy of the voicemail on the disc.

[3]A disc containing a recording of this call is also in the record. At trial, the parties also stipulated to the accuracy of the recording.

purse with the contents spilled out; a flip-flop shoe; a red, blood-like substance on the pavement; and two 9-millimeter Luger shell casings.

¶ 13    Sean Grosvenor, another Illinois State Police crime scene investigator, testified that he processed the crime scene of the Cartage shooting on South Honore Avenue in Markham on August 26, 2011. Grosvenor arrived at 6:35 a.m. and took a sample from a blood-like stain on the walkway leading up to the main entrance of the house in front of which the crime scene was located. He found a 9-millimeter Luger casing on the roof of the passenger's side of a red Nissan Sentra and a hole in the gutter on the east side of the entrance to the building. Grosvenor recovered a bullet from inside that gutter.

¶ 14    Oak Forest Police Investigator Casey Gallagher testified that on August 26, 2011, at 1:35 a.m. he received a call notifying him of a woman lying in the roadway in the South 15400 block of Cicero Avenue. He arrived to find a female victim, who was identified as Johnson, with an apparent gunshot wound to the abdomen. Johnson was breathing, conscious, and appeared to be in a lot of pain. She was moaning and having trouble communicating. Gallagher called for a paramedic unit. He asked Johnson what happened, and she replied "Terrell shot me." He asked, "who is Terrell?" and all the victim could say was "boyfriend." He asked her more questions, but she did not respond. Johnson's purse was in the parking lot, and her Illinois identification card was lying near the purse. There was a phone partially in the opened purse.

¶ 15    Oak Forest Detective Robert Frias arrived at the 15400 block of South Cicero Avenue between 1:30 a.m. and 1:50 a.m. Other police and emergency personnel were on the scene, and Johnson was in an ambulance. Frias entered the ambulance and attempted to speak to Johnson, who was being treated by paramedics while lying on her back on a stretcher and wearing an oxygen mask. Frias asked Johnson who shot her, and she said "Terrell." He asked for other information about Terrell, but she only responded by saying "Terrell." After Johnson stopped responding, she was taken to Christ Hospital. Frias followed the ambulance to the hospital, where he spoke to members of Johnson's family. After speaking to Johnson's family members, Frias determined that defendant was a suspect. An investigative alert was established for a 1999 gold or tan Chevy Malibu with a certain license plate number. The parties stipulated that, as of August 26, 2011, defendant was the registered owner of a gold or tan 1999 Chevy Malibu with that certain license plate number.

¶ 16    Frias testified that he became aware at 12:45 p.m. on August 26, 2011, that defendant's vehicle was located in Lansing, Illinois, at a Howard Johnson motel. Frias and other investigators went to the Howard Johnson motel and arrested defendant in the lobby. Inside of defendant's vehicle, Frias found a black metal 9-millimeter Interarms brand semiautomatic handgun. The handgun had one round in the chamber and three in the magazine. Officers searched defendant's motel room but recovered nothing of evidentiary value.

¶ 17    Jeffrey Parise, a firearms examiner for the Illinois State Police forensic science laboratory, tested the recovered ballistic evidence. Parise obtained the two fired Luger cartridge casings from the scene of the Johnson shooting, the fired bullet and fired Luger cartridge case from the Cartage shooting scene, and the firearm recovered from defendant's vehicle. Parise opined that all of the fired evidence came from the firearm found in defendant's vehicle.

¶ 18    Dr. Adrienne Segovia performed the autopsy on Johnson. The parties stipulated at trial that Johnson was 28 years old, 5 feet 4 inches tall, and weighed 197 lbs. She suffered two gunshot wounds. One wound to the left side of her back, 15.5 inches from the top of the head, and 5

inches to the left of the posterior midline. The second wound was located on the top left side of the back, 16.5 inches beneath the top of her head and 2.2 inches to the left of her posterior midline. The wounds extended to the left side of her chest beneath the breast, the bullet having passed through the left fifth intercostal space, and another gunshot exit wound on the left side of her abdomen. The State rested after presenting this evidence.

¶ 19     Defendant testified on his own behalf that, in August 2011, he lived on the south side of Chicago with his mother and was attending Olive Harvey College. About a month and a half earlier, he had met Johnson and they had developed a sexual relationship. On August 25, 2011, Johnson called him and said she wanted to have some fun. He picked her up around 5 p.m., and they went to a liquor store, and then to the house of defendant's friend, Carmichael Upshaw, who lived at 78th Street and Essex Avenue in Chicago. Johnson was using defendant's phone to call people. Defendant and Johnson were drinking alcohol and smoking marijuana, when Johnson said she wanted some "X" ("ecstasy"). Upshaw said he would obtain it if they gave him $50. Upshaw called a friend, and Johnson purchased the ecstasy from him. Defendant gave Johnson the money to purchase the ecstasy; but he never observed Johnson in possession of the ecstasy that night, and he never observed the ecstasy itself; but he knew Johnson had received it.

¶ 20     Defendant testified that he and Johnson next drove around and purchased more liquor. They then went to the Terrace Hotel in Oak Forest and obtained a room. At the hotel, they "started drinking and having a good time." They had purchased a fifth of Remy 1738 cognac, all of which they proceeded to drink and they became intoxicated. At the hotel, Johnson said she had to make a phone call. Because her phone did not have any more minutes, she used defendant's phone to call her mother. Defendant recalled speaking to Johnson's mother but could not remember what he said. At the hotel, defendant and Johnson engaged in oral sex.

¶ 21     Defendant testified that, about 15 minutes after engaging in oral sex, he went to the bathroom. When he came out of the bathroom, Johnson asked him why he had pictures of a girl on his phone. She was referring to pictures of Cartage, whom defendant described as his ex-girlfriend. Defendant had risqué pictures of Cartage on his phone. After osberving the pictures, Johnson was upset and "flipped out," which led to a physical altercation between the two of them. Defendant testified that they were "tussling with each other"; "she was swinging on me, I was blocking like—I'm one-forty, she's like one-ten. So she was swing [*sic*] on me and I was blocking her and pinning her down most of the time, just laughing."

¶ 22     Defendant testified that, about 15 minutes later, he told her there was "something wrong, I'm sweating real bad, there is something wrong." As he described it, "my heart started beating real fast. It wasn't a feeling from drinking and weed, from marijuana." Defendant told Johnson to call an ambulance. In response, Johnson told him he was "being a p***, she only gave me three or four of 'em," by which he assumed she meant three or four of the pills. He was still panicking, and he hit her in the body, not the face. She swung back, but the fight did not last long. He could not breathe and they stepped outside for air. They walked to defendant's vehicle, and defendant asked Johnson to drive him to the hospital. She told him "no, you need to lighten up." He was asking her "why would you give me this stuff." She grabbed her cell phone and started calling people, saying she was going to get them to "F" defendant up. She called at least three or four numbers. At this point, they were in defendant's vehicle and he felt as though he had been drugged.

¶ 23    Defendant testified that after making the calls, Johnson exited the vehicle and defendant followed. They were still arguing and pushing each other. Defendant carried a gun as a means of protection from "the streets." He testified that he never had a plan of using the gun on Johnson but only planned to have sex with her. Defendant testified that "the fight [was] escalating, and the next thing you know, I shot her." Defendant shot Johnson approximately 10 minutes after they exited his vehicle.

¶ 24    Defendant testified that he next went back to his vehicle and left. As he testified, "I didn't know what was going on. I have only known her for forty-five days, why would I—I didn't know what was going on." Defendant called Cartage. He described Cartage as not only his ex-girlfriend, but also his best friend, so he needed to talk to her. He left her a message. Defendant testified that there were "plenty of" calls, but that the State played only one of them at trial (the voicemail discussed above). When he called Cartage, he heard a man's voice on the phone, and that "really threw me over the top, and from then on, I just, I just snapped." He went to Cartage's house but testified that he had no idea what he was going to do when he arrived. When he arrived, he observed Cartage and Newsome outside. He walked up to them and shot Cartage in the leg. He then entered his vehicle and drove around. He did not remember all the things that happened in detail. He testified that he did not want to kill Cartage. He testified that he did not know where he was going when he was driving around:

> "Basically is,—I knew I was drugged, I know this for a fact. From one o'clock to four o'clock, two women getting shot, it is not me, it is really not. I mean, she probably painted murderous intentions, but no, that is not me. I love [Cartage], and I loved [Johnson]. I didn't even, you know, I planned—I went to the hotel to have a good time, not to shoot anybody. Two hours later I would never believe it, two hours later I would have shot somebody."

¶ 25    On cross-examination, defendant testified that he had his gun in the hotel room, but he changed his testimony and clarified that he did not bring his gun to the hotel room, but first grabbed it when he and Johnson were in his vehicle arguing, before they exited his vehicle and before he shot Johnson. He clarified that he shot Cartage at Newsome's house, not at Cartage's house. He admitted that he sent Cartage a message before coming to Newsome's house in which he called her "the dumbest b*** [he] ever met." Defendant testified that he spoke to police officers at some point about what happened, but not to the Oak Forest police department the day after he was arrested. He testified that he never told the police that he was with a person named Rebee.[4] He did not know who Rebee was. He never told detectives that he was drinking 1800 Cuervo tequila. He never told detectives that he dropped Johnson off at 173rd Street and Christopher. He did not tell the police that he went to the city to meet a person named Stevie. He did not tell the police that he went to 63rd Street and Merrill. He never told police that a girl named China cooked for him. Defendant further testified that he did not explain his actions on August 26, 2011, to Cartage during the September 11, 2011 call because his lawyer had told him not to talk about it.

¶ 26    On redirect examination, defendant's trial counsel asked defendant if he had given his license plate number, his name, and his identification card at both hotels he checked into on the

_____

[4]As described below, Oak Forest Police Officer Rich Belcher testified that defendant told the police that he was with a person named Rebee, and various other things referenced in this paragraph, after they arrested him.

night of August 25 and the early morning of August 26, 2011. After asking these questions, defendant's trial counsel requested a sidebar and the jury was excused. At the sidebar, defendant's trial counsel explained that, while defendant had shown his own identification card to the hotel clerk, he had used a credit card that was linked to another person's account, although it had defendant's name on it. Defendant's trial counsel expressed concern that defendant's fraudulent credit card use was suggestive of other crimes, such as identity theft, and that the State would try to impeach him with such other crimes evidence.

¶ 27      At the sidebar, the State explained that defendant had signed the name of a different person, Joseph Jackson, at the Terrace Hotel. When questioned by the hotel clerk about his signature, defendant said his name was Joseph Jackson. The State explained that there was a video of the transaction showing these things. Although the State did not bring up the subject of defendant's use of false credit card and identification information on cross-examination, the State argued at sidebar that defendant's trial counsel opened the door for this line of questioning on re-cross-examination. The State played the video of defendant checking in for the court at sidebar.

¶ 28      In response, defendant's trial counsel explained at sidebar that the point of asking defendant about checking in was to demonstrate that "there was nothing unusual about any of the events that led up to the fight which escalated to the actual shooting." Defendant's trial counsel argued that defendant would be prejudiced by other crimes evidence, which would not be relevant because the State's theory was not that the murder was planned. The State responded that the video showed that defendant was lying on the stand when he answered his counsel's questions about checking in at the motel. Contrary to what defendant said, the video demonstrated that defendant used a fake name, gave a fake license plate number and incorrect information about the model and year of his vehicle.

¶ 29      The court allowed the State to introduce the other crimes evidence on re-cross-examination. As the court explained at sidebar, the fact that defendant potentially committed perjury on redirect examination was "very relevant" for the jury to make a determination regarding his credibility.

¶ 30      When the jury returned, the State asked defendant if he had used his real name, his real license plate number, and his correct vehicle information when checking in at the Terrace Motel. Defendant testified that he did give his real name, his real license plate number, and his correct vehicle information to the hotel clerk. The State then introduced the receipt and registration card from the Terrace Motel. Defendant confirmed that it was the receipt from the Terrace Motel and that it contained the registration card that he filled out. He then testified that the name on the receipt was Joseph Jackson and that he gave a fake license plate number and a fake description of his vehicle, by saying that he drove a 1995 Chevrolet Caprice when he actually drove a 1999 Chevrolet Malibu. When the State asked defendant, "So when you answered those questions to your attorney you lied, is that correct?" he responded, "technically, it wasn't a lie."

¶ 31      On re-redirect examination, defendant explained the discrepancy in his identifying information at the hotel:

          "DEFENDANT: Okay, this is how it go. I got—I'm no saint, I was doing credit cards, I had a reader, I load up credit cards, I steal profiles.

I had loaded up Joseph Jackson on my credit card. I didn't steal no credit card, use my credit card, loaded up another credit card, so whenever I swipe his credit card that name going to come up.

I clearly—I never normally just check into a hotel, but [Johnson] wanted to stay with me that night, so this whole thing, I checked into the hotel with my credit card, and the credit card said [defendant's name]. But when you swipe the strip through the reader, it is going to say whoever's profile the—

DEFENSE COUNSEL: The point it, eventually you gave them your real identity?

DEFENDANT: Yes, I did. The credit card was mine.

DEFENSE COUNSEL: But the ID was given, right?

DEFENDANT: Yes, it was.

DEFENSE COUNSEL: So the clerk back at the hotel knew your real name, right?

DEFENDANT: I used my real name and my real ID."

On second recross-examination, defendant admitted that he signed the name Joseph Jackson on the receipt at the hotel. The defense then rested its case.

¶ 32　　After defendant testified, the State called three witnesses in rebuttal. First, John Adams testified that he was the desk clerk at the Terrace Motel in Oak Forest, on August 25, 2011, when defendant checked in around 10 p.m. Adams asked defendant for $53 and his identification card. Defendant presented an identification card with the name Joseph Jackson and paid with a credit card in that name. Then he presented another identification card with the name Terrell Randall on it. Defendant had a gold vehicle and there was another person in the vehicle. Adams received no complaints about fighting or screaming from defendant's room. Sometime after midnight, Adams observed defendant on the outside security camera. Adams later observed a female exit defendant's vehicle and go past the office heading towards Cicero Avenue. Then defendant ran past the office towards Cicero Avenue. Adams testified that, at that point, defendant looked scared. Five or ten minutes later, Adams observed defendant go back to his vehicle alone and drive away. The motel had a video surveillance system, and a video from that night was admitted in evidence and published to the jury. According to Adams, the video at 1:26 a.m. shows defendant going after the victim, and at 1:27 a.m. his vehicle leaves the lot with only the defendant in it.

¶ 33　　Next, Detective Frias testified that he observed defendant in Howard Johnson's parking lot when defendant was arrested and there were no visible injuries on defendant's face or body. Frias found no ecstasy pills in the victim's purse or in her clothing.

¶ 34　　Finally, Oak Forest Police Officer Rich Belcher testified that he interviewed defendant at 7:50 p.m. on August 26, 2011. He read defendant his rights. Defendant had no visible injuries on his face or his hands, which were the only parts of defendant that Belcher could observe. Defendant told him that, on August 25, he met Johnson at a park somewhere in Hazel Crest. They were drinking Cuervo 1800 tequila. A friend or acquaintance of Johnson named Rebee came over and sat with them. Defendant had never met Rebee. Defendant left the park between 7 p.m. and 8 p.m. and dropped Johnson in the area of 173rd and Christopher because she was sick from drinking. They left Rebee at the park. After dropping Johnson off, defendant drove to the area of 63rd Street in Chicago and met a friend named Steve and they went to his house. Defendant did not know Steve's last name or address. A girl named China was at Steve's house and cooked them food. Defendant could not remember when he left Steve's house.

¶ 35     Additionally, the State introduced a certified copy of conviction for defendant from November 16, 2010, for the unlawful use of a weapon by a felon.

¶ 36     Following the close of evidence, the trial court held a jury instructions conference. The defense requested instructions on both involuntary intoxication and second degree murder. Over a State objection, the trial court agreed to give the involuntary intoxication instruction based on defendant's own testimony that he believed Johnson may have given him some pills that caused his reaction. As to the second degree murder instruction, defense counsel argued that there was some evidence that defendant was acting under a sudden and intense passion resulting from a provocation. Specifically, counsel contended that the physical altercation between defendant and Johnson, combined with her deliberately drugging him and her threats to call some people to come and "F" him up, could be observed as sufficient provocation, either as mutual combat or as a substantial physical injury or assault.

¶ 37     The trial court concluded that there was not even slight evidence to support the second degree murder instruction, reasoning that there was no adequate provocation where defendant's response was not at all proportional to Johnson's slapping him a few times. The trial court found that the altercation between Johnson and defendant did not amount to mutual combat, especially where defendant responded to the physical altercation with a deadly weapon. The court recounted defendant's testimony that the whole altercation between them had ended before he followed her with a gun, and no reasonable person would observe this as adequate provocation.

¶ 38     Within 15 minutes of beginning deliberations, the jury sent back a note saying, "If we sign a not guilty verdict, will that bring down the charge to second degree murder? [In opening] statements defense asked for lower charge." The trial court responded, "No. You have all the instructions and all the verdict forms. Continue to deliberate."

¶ 39     Based on the foregoing evidence, the jury found defendant guilty of first degree murder and also found that defendant discharged a firearm proximately causing the death of Johnson. Defendant was sentenced to a total of 90 years in IDOC—50 for first degree murder, and 40 for personally discharging a firearm that led to death. At sentencing, the State argued, and the trial court found, that the statutory aggravating factor for causing or threatening serious harm was present. Defendant now appeals.

¶ 40                                              ANALYSIS

¶ 41     Defendant raises three issues on appeal: (1) whether there was at least some slight evidence that defendant acted under a serious provocation, such that the trial court erred by refusing to instruct the jury on a provocation theory of second degree murder; (2) whether defendant was denied effective assistance of counsel where his trial counsel opened the door to evidence of other crimes; and (3) whether the trial court improperly relied upon a factor inherent in the offense of first degree murder during sentencing when it considered in aggravation that defendant's conduct caused serious physical harm. For the following reasons, we affirm.

¶ 42                           I. Second Degree Murder Instruction

¶ 43     The parties disagree on the applicable standard of review for reviewing a trial court's decision not to give a jury instruction. Defendant argues that the standard of review is *de novo* under *People v. Washington*, 2012 IL 110283, ¶ 19 ("The question of whether sufficient

evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review."). By contrast, the State argues that the proper standard of review is abuse of discretion under *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997) ("A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury."), and *People v. Garcia*, 188 Ill. 2d 265, 283 (1999) (" 'abuse of discretion' standard of review must be applied in determining the propriety of the trial court's [decision to submit a lesser included offense instruction to the jury]").

¶ 44    As defendant observes, a case involving the proper standard of review regarding a trial court's decision on whether or not to submit an instruction to the jury is currently pending before the Illinois Supreme Court.[5] Since the supreme court is currently addressing this issue, we decline to resolve it here. Furthermore, we do not need to resolve this conflict in the present case because we find that the trial court did not err in refusing to instruct the jury on the provocation theory of second degree murder under either standard of review. Accordingly, we will review the trial court's decision not to give the second degree murder instruction under a *de novo* standard, which is less deferential than an abuse of discretion standard. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶¶ 17, 24. Under a *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning. *People v. Vincent*, 226 Ill. 2d 1, 14 (2007). *De novo* review is completely independent of the trial court's decision. *United States Steel Corp. v. Illinois Pollution Control Board*, 384 Ill. App. 3d 457, 461 (2008). *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 45    In pertinent part, the second degree murder statute provides that a person commits second degree murder when that person commits the statutory offense of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2010)), but "at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9-2(a)(1) (West 2010). The statute defines serious provocation as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2010). For purposes of mitigating first degree murder based on serious provocation, the only categories of provocation that are recognized by the Illinois Supreme Court are (1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Sipp*, 378 Ill. App. 3d 157, 166 (2007) (citing *People v. Chevalier*, 131 Ill. 2d 66, 73 (1989)). "Passion on the part of the slayer, no matter how violent, will not relieve her from liability for murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate. If the provocation is insufficient, the crime is murder." *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

¶ 46    When deciding whether or not to give an instruction, the trial court must decide if there is "some foundation for the instruction in the evidence"; it is not the trial court's role to weigh the evidence in a jury case. *People v. Jones*, 175 Ill. 2d 126, 132 (1997). "Very slight evidence

---

[5]The supreme court allowed leave to appeal in *People v. McDonald*, No. 118882, on May 27, 2015. The appeal was taken from an unpublished Rule 23 order, *People v. McDonald*, 2014 IL App (1st) 121009-U, which discusses the conflict in Illinois precedent on the proper standard of review for reviewing a trial court's decision to give a jury instruction.

upon a given theory of a case will justify the giving of an instruction." *Jones*, 175 Ill. 2d at 132. On appeal, defendant contends that the trial court should have instructed the jury on second degree murder because there was some evidence to show that he was acting under a serious provocation. Specifically, defendant claims that he was entitled to the second degree murder instruction under a theory of mutual combat.

¶ 47    "Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *Austin*, 133 Ill. 2d at 125. For purposes of mutual combat, "[a] slight provocation is not enough, because the provocation must be proportionate to the manner in which the accused retaliated." *Austin*, 133 Ill. 2d at 126-27. "There is no mutual combat where the manner in which the accused retaliates is out of all proportion to the provocation, particularly where homicide is committed with a deadly weapon." *People v. Sutton*, 353 Ill. App. 3d 487, 496 (2004).

¶ 48    Our courts have consistently held that mutual combat does not apply where a defendant responds with deadly force to a physical altercation with an unarmed victim. *Austin*, 133 Ill. 2d at 127. For instance, in *Austin*, the defendant shot a bus driver to death after the bus driver spoke gruffly with her, struck her on the hand with a transfer punch, and engaged in a "fairly even" fistfight with her before forcing her off the bus. *Austin*, 133 Ill. 2d at 127. Our supreme court found that mutual combat could not apply because there was no objective indication that the defendant had reason to fear for her life, and so shooting the bus driver was an act "completely out of proportion to the provocation." *Austin*, 133 Ill. 2d at 127. Similarly, this court recently held in *People v. Lauderdale*, 2012 IL App (1st) 100939, that there was no evidence of mutual combat where the unarmed victim, who was larger than the defendant, punched the defendant in the jaw, and the defendant retaliated by shooting the victim multiple times. *Lauderdale*, 2012 IL App (1st) 100939, ¶¶ 28-29. Quoting *Austin*, this court found that the defendant's acts were " 'out of all proportion' " to the victim's provocation. *Lauderdale*, 2012 IL App (1st) 100939, ¶¶ 26-29 (quoting *Austin*, 133 Ill. 2d at 125).

¶ 49    In the case at bar, there is no evidence to support defendant's theory of mutual combat. As evidence of provocation, defendant stresses that Johnson allegedly drugged him, was hitting him repeatedly, fighting with him verbally and calling people to come "F" him up. First, even if Johnson did drug defendant, it would be irrelevant to his argument for a second degree murder instruction. At defendant's request, the trial court instructed the jury on involuntary intoxication. The jury's conviction shows that they did not find that defendant's actions were the product of involuntary intoxication. Furthermore, there is no category of serious provocation for involuntary intoxication. Second, defendant's act of shooting Johnson was completely out of proportion to Johnson's actions. Like the victims in *Austin* and *Lauderdale*, Johnson was unarmed. Furthermore, according to defendant's own testimony, the size disparity between himself and Johnson made her attempts to hurt him comical to him. In *Lauderdale*, 2012 IL App (1st) 100939, ¶ 27, the victim was significantly larger than the defendant and punched the defendant in the jaw, but this court found that the defendant's act of shooting the victim was out of proportion to the provocation. Here, defendant's actions were even more disproportionate where Johnson was smaller than him and defendant testified that he was "just laughing" at her attempt to swing at him. Moreover, even if Johnson had called people to "F" up defendant, there is no evidence that she successfully contacted anyone or that

anyone came. Accordingly, defendant was not entitled to an instruction of second degree murder on a mutual combat theory.

¶ 50    Defendant argues that *Austin* and *Lauderdale* are distinguishable. Defendant argues that *Austin* is distinguishable because the fight in the instant case was a "prolonged struggle," whereas in Austin it was a brief encounter. However, in *Austin* the supreme court emphasized that the defendant's action of shooting the bus driver was out of proportion because the defendant had no reason to fear for her life. *Austin*, 133 Ill. 2d at 127. Here, defendant has made no arguments that he had reason to fear for his life because of Johnson's actions. Accordingly, he has not persuasively distinguished *Austin*. Defendant contends that *Lauderdale* is distinguishable because the issue in *Lauderdale* was whether or not the defendant's counsel was ineffective for failing to argue at sentencing that the defendant acted under an intense passion from a serious provocation, such that his sentencing could have been reduced from a Class X to a Class 1 sentence. *Lauderdale*, 2012 IL App (1st) 100939, ¶ 20. Despite observing this distinction, defendant has failed to argue how this distinction is material. In order to resolve the issue in *Lauderdale*, this court had to decide the issue currently before us—namely, whether or not evidence of mutual combat existed in the record. This court relied heavily on *Austin* in its mutual combat analysis. *Lauderdale*, 2012 IL App (1st) 100939, ¶¶ 30-31. Accordingly, we decline to disregard *Lauderdale* on this basis.

¶ 51    Defendant relies on *People v. Phillips*, 159 Ill. App. 3d 142 (1987) to argue that the fact that he held a dangerous weapon is not alone sufficient to preclude the possibility of mitigation. In *Phillips*, the defendant testified that he brought a knife to an encounter with the victim only to frighten the victim so that the victim would stop harassing him. *Phillips*, 159 Ill. App. 3d at 148. The defendant testified that the victim grabbed the knife from his waistband and attempted to stab him, after which the defendant killed the victim. *Phillips*, 159 Ill. App. 3d at 148. This court found that the fact that the defendant brought a knife to the encounter did not preclude the possibility of mitigation because he testified that he did not intend to use the knife. *Phillips*, 159 Ill. App. 3d at 148. Accordingly, an issue of fact for the jury existed as to whether or not the defendant was provoked. *Phillips*, 159 Ill. App. 3d at 148. In the case at bar, defendant argues that he also did not have the intent to use his gun when he entered the encounter, so the jury should have been instructed on mutual combat.

¶ 52    *Phillips* is distinguishable. In *Phillips*, the victim had attempted to stab the defendant, according to the defendant's testimony. *Phillips*, 159 Ill. App. 3d at 148. Accordingly, there was significant evidence of mutual combat, such that the fact that the defendant had introduced a weapon was not preclusive of mitigation. *Phillips*, 159 Ill. App. 3d at 148. By contrast, in the case at bar, there is no evidence that the victim tried first to use defendant's weapon against defendant. Defendant is not entitled to an instruction on second degree murder simply because he testifies that he did not intend to use his gun. He must also show that there is some evidence of reasonable provocation, which he has failed to do.

¶ 53    Defendant also argues that we should consider the fact that the jury sent a note to the trial court asking whether an acquittal on first degree murder would have the effect of finding defendant guilty of second degree murder. Defendant contends that, because the jurors expressed interest in the possibility of some outcome between acquittal and a first degree murder conviction, they may have perceived some mitigating factor in the evidence, such that the trial court should have given them the option that a second degree murder instruction would have provided. We find defendant's argument on this point unpersuasive. First, defendant

himself has advocated that we review the trial court's decision to not instruct the jury on second degree murder on a *de novo* basis. Reviewing a question of law *de novo* mandates no deference to the trial court or anyone else. By contrast, an abuse of discretion standard allows the trial *judge* significant leeway to make a decision. In neither scenario does the jury have the ability to influence whether or not the court gives an instruction. Second, any inferences from the jury's question would be tenuous and speculative; there is no solid basis for inferring the jury's opinion on the matter from a question about it and we do not know whether it was a question prepared by one or more jurors. Accordingly, the jury question is not relevant to our review.

¶ 54    For the foregoing reasons, we conclude that the trial court did not err in refusing defendant's jury instruction for second degree murder, as there was no evidence of a serious provocation in the record to support the giving of the instruction.

¶ 55                    II. Ineffective Assistance of Counsel

¶ 56    Second, defendant claims that he was denied effective assistance of counsel when his trial counsel opened the door to the introduction of other crimes evidence. The Illinois Supreme Court has instructed that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004); *Strickland*, 466 U.S. at 687.

¶ 57    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135. Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135.

¶ 58    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). A reviewing court will not second-guess a counsel's trial strategy simply because defendant was convicted. *People v. Johnson*, 385 Ill. App. 3d 585, 602 (2008). Moreover, the court gives a great amount of deference to counsel's judgment, and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

¶ 59    In the case at bar, defendant's trial counsel elicited testimony from defendant describing in detail the payment methods and identification he used to check into a motel a few hours prior to the offense. During defense counsel's redirect examination of defendant, counsel asked whether defendant checked into the motel using his real name.

- 13 -

¶ 60     Defendant's trial counsel then requested a sidebar, where counsel explained that he was attempting to demonstrate that defendant used his real name to check in because he had nothing to hide and was not planning to shoot the victim. This line of questioning opened the door for the State to proceed with questions about defendant's use of a false credit card and identification on re-cross-examination. The trial court ruled that evidence of prior credit card crimes was admissible because it was "very relevant" to defendant's credibility.

¶ 61     The United States Supreme Court has instructed that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice *** that course should be followed." *Strickland*, 466 U.S. at 697. Therefore, this court need not determine whether defendant's trial counsel's strategy—of risking impeaching defendant's credibility in order to demonstrate lack of premeditation—fell below an objective standard of reasonableness, because this potential error did not prejudice defendant.

¶ 62     Trial counsel's decision to open the door to the prior crimes evidence did not prejudice defendant, where the State presented overwhelming evidence that defendant shot both Johnson and Cartage, who were unarmed, including his own testimony admitting he shot them. Defendant was already impeached due to both the false alibi he gave at the time of his arrest and his contradictory testimony during cross-examination. *Supra* ¶¶ 27, 31. As a result, defendant suffered no prejudice because he cannot show that, but for the introduction of his prior credit card fraud, he would not have been convicted of first degree murder.

¶ 63                                  III. Sentencing

¶ 64     Third, defendant claims that the trial court improperly relied upon an aggravating factor, inherent in the offense, namely, conduct that causes or threatened serious bodily harm and that this improper consideration warrants a new sentencing hearing. During defendant's sentencing hearing, the assistant State's attorney (ASA) commented on aggravating factors for the trial court to consider when sentencing the defendant:

         "ASA: [I]f you look at factors in aggravation *** there are several that meet *** the criteria to be considered *** when sentencing the defendant on this case. The defendant's conduct caused or threatened serious harm. The defendant has a history of prior delinquency or criminal activity. The sentence is necessary to deter others from committing the same crime. Judge, with regarded to this defendant, you have the factors of the case before [Y]our Honor to consider in aggravation and how cowardly and heinous this crime was."

¶ 65     The ASA commented on defendant's conduct, and how he had a lengthy history of criminal activity, and the ASA ended her statement by asking the trial court to consider the facts of this case, particularly defendant's conduct, and his previous criminal history, in ordering the maximum sentence.

¶ 66     The trial court then considered the factors in aggravation:

         "THE COURT: [W]ith regards to the factors in aggravation, the Court, as the State has indicated here, the defendant qualifies under aggravating factors, if the defendant's conduct caused or threatened serious harm.

         Defendant has a significant history of prior criminal delinquency—or criminal activity here ***. [T]he defendant was given an opportunity with probation with his first two felony convictions back in 1998, and then proceeded to commit additional

felonies, most of which were drug related or gun related during the course of the rest of his life, and in essence, spent most of his life in and out of the penitentiary or on parole. And he was on parole at the time the commission of this offense. That is a significant factor, along with the factor that he caused death to—what has—people have—his loved ones have shown was a very vibrant person.

Also, their [*sic*] sentence is necessary to deter others from committing the same type of crime. I believe that factor is also present here."

The trial court then concluded defendant's sentencing:

"THE COURT: I've looked at the factors in mitigation, none of which qualify ***. Based on all the factors on aggravation and mitigation, based on everything, the factors of the case and everything I've heard, it will be the sentence of this Court, uh, as to Count 4, the sentence of this Court will be 50 years in the Illinois Department of Corrections."

¶ 67    The parties disagree on the applicable standard of review for the trial court's sentencing. Defendant argues that *de novo* review is required when the trial court relied on an improper factor when imposing a sentence. See *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008). The State contends that an abuse of discretion standard should be applied, as the trial court is in the best position to make a reasoned judgment on specific factors, such as a defendant's credibility, demeanor, habits, etc. *People v. Steppan*, 105 Ill. 2d 310, 323 (1985); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). For the following reasons, we agree with the State and apply an abuse of discretion standard to the trial court's sentencing of defendant in the case at bar.

¶ 68    "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800. The sentence in the case at bar, 90 years, is well within the statutory range (720 ILCS 5/5-4.5-20(a) (West 2014) (20-year minimum for first degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2014) (add on of 25 years to natural life for murder with firearm)).

¶ 69    The State relies on *People v. Beals*, 162 Ill. 2d 497 (1994), where the supreme court determined that listing factors during sentencing does not mean that the trial court relied on all of those factors in determining the appropriate sentence. In *Beals*, the trial court stated the following during defendant's sentencing hearing:

" 'In aggravation the first guideline indicated in the statute is "whether the conduct of the defendant caused or threatened serious harm." Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' " *Beals*, 162 Ill. 2d at 509.

The rationale of our supreme court was that:

"The trial court never indicated, however, that it 'considered' the victim's death as an aggravating factor justifying an extended-term sentence. Rather, the record suggests that the trial court statement was simply a general passing comment based upon the consequences of the defendant's actions.

Even assuming *arguendo* that the trial court's comment may be construed in the manner that the defendant suggests, we nevertheless conclude that the defendant's sentence should be affirmed. A trial court's reliance upon an improper factor does not

always necessitate remandment for resentencing. [Citation.] A cause must be remanded for resentencing only where the reviewing court is unable to determine the weight given to an improperly considered factor. [Citations.] Where it can be determined from the record that the weight placed upon the improperly considered aggravating factor was insignificant and that it did not lead to a greater sentence, remandment is not required. [Citation.]" *Beals*, 162 Ill. 2d at 509-10.

¶ 70 Here, it is evident from the record that the trial court placed little, if any, weight upon the fact that defendant's conduct caused the ultimate harm. Although the trial court observed that defendant's conduct caused Johnson's death, the record clearly reveals that the court realized upon "all the factors [in] aggravation and mitigation, based on everything, the factors of the case and everything I've heard" in sentencing defendant.

¶ 71 "Upon our review of the record, we conclude that any weight that the trial court placed on the fact that the defendant's conduct caused the ultimate harm was insignificant, and did not result in a greater sentence." *Beals*, 162 Ill. 2d at 510 (citing *People v. Bourke*, 96 Ill. 2d 327, 332 (1983), and *People v. White*, 114 Ill. 2d 61, 67-68 (1986)). Accordingly, we find defendant's argument that we must remand this cause for resentencing unpersuasive.

¶ 72 CONCLUSION

¶ 73 For the foregoing reasons, we conclude that the trial court did not err in refusing to instruct the jury on second degree murder, that defendant did not receive ineffective counsel, and that the trial court did not improperly rely on an aggravating factor during sentencing.

¶ 74 Affirmed.