2021 IL App (1st) 190819-U

No. 1-19-0819

Order filed December 15, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 19513 |
| | ) | |
| BRANDON YOUNG, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for second-degree murder affirmed. Evidence was sufficient to convict, and trial counsel was not ineffective.

¶ 2    Following a bench trial, defendant Brandon Young was convicted of second-degree murder (720 ILCS 5/9-2(a)(2) (West 2014)) and sentenced to 16 years in prison. On appeal, defendant challenges the sufficiency of the evidence to sustain his conviction, arguing that the State failed to prove beyond a reasonable doubt that his belief in the need to act in self-defense was unreasonable.

Defendant further claims his trial counsel was ineffective for failing to challenge the admissibility of the sole eyewitness's hearsay statements to police, which were presented via stipulation. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from the October 31, 2015, stabbing death of a man named Dorian Smith in Chicago. Following his arrest, defendant was charged by indictment with two counts of first-degree murder, robbery, and unlawful use of a weapon by a felon. In his answer to discovery, defendant asserted self-defense.

¶ 4    Following opening statements, the State presented the stipulated testimony of Felicia Smith; Dorian Smith was her 43-year-old nephew. (Because they share a last name, we will refer to Felicia and the victim, Dorian, by their first names.) The parties stipulated that Felicia would have testified that she was addicted to crack cocaine, heroin, and alcohol, and had used crack cocaine on the day in question. She also had been suffering from mental illness for at least 15 years, including schizoaffective disorder, bipolar disorder, post-traumatic stress disorder, and depression, and she sometimes experienced auditory and visual hallucinations. Felicia was prescribed various medications for these conditions.

¶ 5    The parties stipulated that Felicia would have testified that she had an initial conversation with the police at her home on October 31, 2015. During this conversation, she told the police that Dorian came to her apartment around noon the previous day. Defendant, whom she had known for a week or two, arrived later. At some point, she went out to buy cigarettes, leaving Dorian and defendant alone in the apartment. There were no problems between the two men at that time.

¶ 6    Later, when it was time to go to sleep, defendant undressed in Felicia's bedroom so that he was wearing only boxer shorts and socks. Defendant walked out of the bedroom. Felicia then heard

some moaning. She opened her bedroom door and saw defendant holding two knives, one in each hand, and stabbing Dorian, who did not have anything in his hands and was backing up. Felicia said, "What are you doing?" and tried to get in between the two men. She then retreated to her bedroom to get her cell phone and call the police. Defendant came into the bedroom, holding a knife, and "snatched" the phone from her. Defendant grabbed his clothes and left the apartment with Felicia's phone.

¶ 7     The parties stipulated that, during Felicia's initial conversation with the police, she did not tell them that any illegal narcotics were purchased or used prior to or during the incident. She also did not tell the police about any sexual contact or relationship she had with defendant.

¶ 8     Following the initial conversation with the police, Felicia went to the police station. There, she looked at a photo array that contained a picture of defendant. She identified a different person in the array as "the guy that stabbed my nephew." About four hours later, she viewed a lineup and identified defendant as the person who stabbed Dorian. Defendant was the only person who was included in both the photo array and the lineup.

¶ 9     The parties stipulated that, after viewing the lineup, Felicia had a second conversation with the police. She told the police that she had met defendant "a week or so" earlier through a friend. On October 30, 2015, Dorian was at her apartment and asked her to buy him marijuana and crack cocaine. As Felicia was leaving to do so, she ran into defendant. Felicia and defendant had made plans that he would come over that day "so they could get high and have sex." She introduced defendant to Dorian and then left to buy crack cocaine. When she returned, she and defendant smoked crack in the bedroom, while Dorian smoked crack in the living room. Throughout the evening, she went out 7 to 10 times to purchase crack cocaine, and she and defendant engaged in

sexual acts several times. At some point, defendant and Dorian went out together to buy crack cocaine. Defendant bought most of the crack cocaine, but Dorian had given Felicia money as well.

¶ 10    Felicia told the police that later, when defendant was getting ready for bed, he stripped down to his boxer shorts and socks. He left the bedroom; a minute or two later, Felicia heard a moan. She stepped outside the bedroom and saw defendant holding two knives, stabbing Dorian. Felicia yelled, "What are you doing?" She then ran back into her bedroom to get her phone and call the police. Defendant came into the bedroom, "snatched" the phone from her hands, grabbed his clothes, and ran out the apartment's front door. Felicia saw Dorian on the floor in the hallway. She saw a butcher's knife under him and saw a butcher's knife in Dorian's hand "like he grabbed it." The parties stipulated that Felicia would testify she was under the influence of crack cocaine during the incident and that the incident happened quickly.

¶ 11    Chicago police officer Paul Corsos testified that, in the early morning hours of October 31, 2015, he and his partner responded to the scene. A few minutes later, they were dispatched to another location because "an individual that may have been at the original address of the call was calling from that new address." When Corsos arrived at the second address, he saw defendant, whom he identified in court. Without prompting, defendant stated that "someone had attempted to rob and or rape him and he had stabbed someone."

¶ 12    Chicago police detective Cunningham (whose first name does not appear in the record) testified that he and his partner responded to the scene around 12:30 a.m. Thereafter, Cunningham went to the hospital and observed Dorian's body and the injuries he had sustained. In court, Cunningham described those injuries as severe stab wounds across his abdomen and chest, and stab wounds on his head, neck, hands, and wrists.

¶ 13    Chicago police officer Paul Presnell, a forensic investigator, testified that around 2 a.m. on October 31, 2015, he was assigned to investigate and process the scene. Presnell described the layout of Felicia's apartment. From the front door, straight ahead was the sole bedroom. To the left was a hallway, the kitchen, and a bathroom, and to the right was a living room. Presnell observed "a lot" of blood on the kitchen floor, in the hallway, on the walls, and behind the front door. During his search for evidence, he found three knives, three cell phones, and clothing. One knife was in the hallway right outside the apartment. The other two knives were right inside the apartment by the front door. The clothing was in the hallway outside the apartment. Presnell took photographs of the apartment and of Felicia.

¶ 14    Presnell went to the hospital to take postmortem photographs of Dorian and fingerprint him. Presnell then went to the police station to "process" defendant, whom he identified in court. While photographing defendant, Presnell did not observe any injuries on his body. When Presnell asked defendant if he had any injuries, defendant pointed to his hand and showed him "a little injury," which Presnell photographed. The photograph Presnell took of defendant was introduced into evidence. Presnell testified that it depicted the injury that defendant told Presnell about, "in the middle top part of his hand." Presnell circled the injury with a pen. The photograph, which is included in the record on appeal, depicts a shallow cut or scratch on the heel of defendant's left palm, near the thumb.

¶ 15    The parties stipulated that the medical examiner who performed Dorian's autopsy would have testified that his body measured 69 inches and weighed 221 pounds. The examiner observed eight incised wounds to Dorian's face, scalp, left hand, and left shin, and four stab wounds to the upper back, left chest, and left abdomen. The results of toxicology testing were positive for

benzoylecgonine and cocaine. The examiner concluded that Dorian died as a result of multiple sharp force injuries and that the manner of death was homicide.

¶ 16    Defendant began his case-in-chief with the stipulated testimony of his nephew, Ammon Stewart. The parties stipulated that if called as a witness, Stewart would have testified that in the early morning hours of October 31, 2015, defendant came into the apartment they shared, sweating and breathing hard, as if he had been running. Defendant asked Stewart to use his cell phone to call the police. Defendant went into another room, made a call, returned Stewart's phone to him, and went outside. Stewart looked out a window and saw the police arrive and place defendant in a police car.

¶ 17    Defendant testified that on October 28, 2015, he met Felicia through a friend, went to her apartment, and got high and had sex with her. They made plans to meet again two days later, to get high and have sex again. On October 30, 2015, defendant arrived at Felicia's apartment around 1:30 or 2 p.m. He was surprised to see that another person, whom Felicia said was her nephew, Dorian, present in the living room. Defendant and Felicia went into the bedroom and started consuming crack cocaine and having sex. Over the course of the day, Felicia went out several times to purchase more drugs. Once, Felicia took longer to return, so defendant and Dorian went out together to purchase drugs. After Dorian bought three bags, they returned to the apartment. Dorian kept one bag, and Felicia and defendant each took one bag into the bedroom, where they consumed the drugs and had sex.

¶ 18    At one point, defendant was wearing only boxer shorts and socks, and Felicia was naked. Defendant was lying on his back on the bed and she "straddled [his] face." Dorian came into the bedroom and tried to pull down defendant's boxer shorts. Defendant grabbed his boxer shorts with

one hand, pushed Felicia off him, jumped up, and said, "What the F?" Dorian told defendant that he would have "to give up something" in exchange for the bags of drugs he had purchased. Defendant took Dorian's statement to mean that Dorian "was trying to take my manhood or something for the price of those bags he just bought." By "take [my] manhood," defendant "meant like rape me or hurt me or some type of way."

¶ 19    Defendant told Dorian he was crazy. Dorian grabbed defendant, and the two men proceeded to wrestle and tussle. Defendant got away and ran into the kitchen area. Dorian was right behind defendant, grabbing him and trying to pull him to the ground. Dorian had defendant in "a choke arm hold" from behind. Defendant saw a loose knife on the counter, grabbed it, and jerked it behind him in a swinging motion. Dorian let defendant go.

¶ 20    Defendant backed up and screamed for help. Dorian "bull-rushed" defendant, pushed him toward the wall, and took the knife from him. Defendant grabbed another knife from a butcher block on the counter. He testified that he "kept swinging it at him because he kept coming at me." Defendant backed into the bedroom. Felicia jumped on his back. Defendant pushed her off, grabbed his clothes and shoes off the floor, and ran to the front door. Dorian was standing in front of the door, bleeding profusely. Dorian "act[ed] like he was going to come at" defendant, so defendant swung the knife again. Dorian ran out the front door. Defendant followed him out the door, but then ran in the opposite direction.

¶ 21    Defendant testified that he left his cell phone in the apartment in his haste to get away. He denied taking Felicia's phone. He ran home and called the police using his nephew's phone. He told the police what happened and reported that Dorian was "going to need an ambulance." After completing the call, defendant went outside and waited for the police to arrive. He eventually

flagged down two officers, who searched him and put him in their car. According to defendant, he did not know Dorian was deceased until he arrived at the police station. He stated that he never meant to "fatally hurt" Dorian, but rather, "just wanted him to get up off me." Defendant testified that he felt terrible and remorseful for Dorian's family and wanted to apologize to them "for bringing them hurt."

¶ 22    On cross-examination, defendant testified that in October 2015, he was six feet tall and weighed 177 pounds. When shown a photograph of Dorian, he agreed Dorian was "the person [he] stabbed 12 times." He also agreed that when he first ran out of the bedroom, he ran into the kitchen even though no one was blocking his way to the front door. He also agreed that after Dorian took the knife from him, Dorian did not stab him. He believed Dorian did not do so because he was injured due to defendant stabbing him. Defendant denied ever having had two knives in his hands at the same time.

¶ 23    In rebuttal, the State presented a stipulation that when defendant was arrested, it was noted that his weight was 205 pounds.

¶ 24    The trial court found that while the State had proved defendant guilty of first degree murder, "there was a degree of plausibility in his remarks regarding the events on the day in question." The court then stated as follows:

> "But it's important to note—and I think his regret points to this fact—that while the State has proved him guilty of first degree murder, the question is whether or not in this particular circumstance I could find the defendant was acting to defend himself, or perhaps if he was acting to defend himself, was he acting unreasonably in that he was, that he had an unreasonable belief in self-defense.

It would be the defendant's burden to prove that, and I think his testimony did that.

I'm going to find today the defendant is guilty for the offense of second-degree murder, and I'm going to indicate that in this court's view his testimony and his demeanor and the evidence itself all supports a finding that he was defending himself, but that belief was unreasonable."

The court found defendant guilty of the lesser mitigated offense of second-degree murder on counts I and II, which it merged. The court found defendant not guilty of robbery, count III, and unlawful use of a weapon by a felon, count IV.

¶ 25    Defendant filed a post-trial motion, which the court denied. The court sentenced defendant to 16 years in prison.

¶ 26    On appeal, defendant first challenges the sufficiency of the evidence to sustain his conviction for second-degree murder.

¶ 27    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 28    Defendant argues that his conviction for second-degree murder should be reversed, as the evidence showed he reasonably believed that he needed to defend himself against Dorian, and the force he used was necessary to prevent imminent death or great bodily harm. He asserts that Dorian wanted him to pay for the drugs he purchased, attempted to force him to engage in sexual relations, and then chased him into the kitchen and placed him in a choke hold. Defendant argues that he reasonably feared for his life when he grabbed a nearby knife and swung it to get out of Dorian's grip. And after Dorian pushed him against a wall and took the first knife from him, defendant reasonably feared for his life when he picked up a second knife and swung it until Dorian finally stopped "coming at" him and fled the apartment. Finally, defendant asserts that Felicia's unsworn statements to the police cannot be credited over his own trial testimony, as she was under the influence of cocaine and did not witness the entire incident.

¶ 29    Defendant was charged with first-degree murder. First-degree murder occurs when an offender kills another individual without lawful justification and either (1) intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death, (2) knows that such acts create a strong probability of death or great bodily harm to that individual or another, or (3) is attempting or committing a forcible felony other than second-degree murder. 720 ILCS 5/9-1(a) (West 2014). If the State establishes the elements of first-degree murder beyond a reasonable doubt, then the trier of fact must address the issue of lawful justification. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 30    One recognized lawful justification to first-degree murder is the affirmative defense of self-defense. *Id.* In order to raise self-defense, a defendant must provide some evidence that (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor;

(3) the danger of harm was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. 720 ILCS 5/7-1 (West 2014); *People v. Lee*, 213 Ill. 2d 218, 225 (2004). If the defendant meets this burden, the burden of proof shifts back to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 224. The State carries this burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *Id.* at 225.

¶ 31    If the defendant's claim of self-defense fails, the trier of fact must then find the defendant guilty of either first- or second-degree murder. *Jeffries*, 164 Ill. 2d at 128. Second-degree murder occurs when an individual commits first degree murder, but a mitigating factor is present. See *People v. Thompson*, 354 Ill. App. 3d 579, 585, 587 (2004); see also 720 ILCS 5/9-2 (West 2012). The mitigating factor relevant in the instant case is if "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the [self-defense] principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2 (a)(2) (West 2012).

¶ 32    The issue here is whether the State proved beyond a reasonable doubt that the actions taken by defendant were not justified because defendant's belief in the need to act in self-defense was unreasonable. See *Lee*, 213 Ill. 2d at 224. "The reasonableness of an individual's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact." *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998). The use and amount of force exercised must be necessary to avert the danger. *Id.* at 836-37.

¶ 33    After carefully considering all the evidence in the light most favorable to the prosecution, we find that a rational factfinder could have concluded that defendant's belief that he had the right to use deadly force in self-defense against Dorian was unreasonable. The record shows that Dorian and defendant were approximately the same size and engaged in a physical struggle. According to defendant's account of events, Dorian had him in "a choke arm hold" from behind when defendant picked up a knife and jerked it behind him in a swinging motion. Dorian let defendant go but then pushed defendant and took the knife. Defendant acknowledged that, after taking the knife, Dorian did not stab him. Defendant grabbed a second knife and "kept swinging it at [Dorian] because [Dorian] kept coming at [him]." Defendant went into the bedroom, had an interaction with Felicia, and then ran to the apartment's entrance. Dorian was standing in front of the door, bleeding profusely, and "act[ing] like he was going to come at" defendant, so defendant swung the knife again.

¶ 34    But the medical examiner's examination of Dorian's body revealed 12 knife wounds: eight incised wounds to his face, scalp, left hand, and left shin, and four stab wounds to his upper back, left chest, and left abdomen. These injuries stand in stark contrast to defendant's single superficial cut or scratch on his hand. And the existence of a stab wound on Dorian's upper back contradicts defendant's testimony that he merely swung the first knife at Dorian while Dorian held him in a choke hold, and swung the second knife at Dorian as Dorian was "coming at" him or "act[ing] like he was going to come at" him, as neither of those scenarios would have presented an opportunity for defendant to stab Dorian in the back.

¶ 35    Given this evidence taken in the light most favorable to the State, the trial court could have rationally concluded that the amount of force defendant exercised was more than that

necessary to avert the danger Dorian presented. See *Hawkins*, 296 Ill. App. 3d at 836-37. Even in the scenario defendant testified to at trial, Dorian did not use deadly force after he let defendant go from the choke hold. Yet defendant, who was about the same size as Dorian, continued to swing the second knife at Dorian after he was released, simply because Dorian was "coming at" him or was "act[ing] like he was going to come at" him. Defendant did not specify whether Dorian was still holding the first knife or was empty-handed, and we cannot ignore that defendant did not suffer any bodily harm beyond the superficial injury to his hand. See *id.* at 838. The trial court could have reasonably concluded that stabbing Dorian 12 times with a knife— including once in the back—was not reasonable in this case. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force.").

¶ 36    Thus, the trial court could have rationally found that the State proved that defendant's belief in the necessity of using deadly force in self-defense was unreasonable. The evidence supporting defendant's conviction for second-degree murder was not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Defendant's challenge to the sufficiency of the evidence fails.

¶ 37    Defendant's second claim on appeal is that his trial counsel "rendered ineffective assistance when he failed to challenge the admissibility of Felicia Smith's inadmissible hearsay statements to the police." He argues that Felicia's two statements to the police were offered to establish the truth of the matter asserted and did not fall within any hearsay exceptions. He asserts that counsel's failure was not sound trial strategy, as Felicia's statements damaged his self-defense claim by bolstering the State's theory that he did not reasonably believe he needed to defend himself. He

maintains that, had counsel objected to the statements contained in the stipulation, there was a reasonable probability that he would have been acquitted, as the remaining evidence showed he acted in self-defense.

¶ 38   To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If a claim may be determined on the basis that there is no prejudice, it is not necessary for a reviewing court to consider whether counsel's performance was deficient. See *id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice *** that course should be followed."); *People v. Heard*, 187 Ill. 2d 36, 67-68 (1999).

¶ 39   We follow that course here. We need not determine whether Felicia's statements to the police were hearsay, whether an exception to the hearsay rule applied, or whether defense counsel's failure to object to the statements was sound or unreasonable. Defendant cannot establish that the failure to object to this stipulated testimony prejudiced him at trial.  That is, even without Felicia's statements to the police, the evidence against defendant was more than sufficient to convict.

¶ 40   The State's evidence at trial was that defendant told the police he had stabbed someone who "had attempted to rob and or rape him;" that the police discovered a crime scene with "a lot" of blood on the kitchen floor, in the hallway, on the walls, and behind the front door; that Dorian

suffered eight incised wounds to his face, scalp, left hand, and left shin, and four stab wounds to the upper back, left chest, and left abdomen; and that defendant's only injury was one superficial cut or scratch to his hand. Added to this, defendant testified that after Dorian placed him in a choke hold, defendant swung a knife at Dorian, and Dorian released and disarmed defendant. Then defendant picked up a second knife and swung it at Dorian while Dorian was "coming at" defendant or was "act[ing] like he was going to come at" him. Further, defendant agreed on cross-examination that after Dorian took the first knife from him, Dorian did not use that knife to stab him.

¶ 41     We thus find that the evidence of defendant's guilt of second-degree murder, even absent Felicia's statements to the police, was overwhelming. See, *e.g.*, *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 54 (finding it not arguable that outcome of defendant's murder trial would have been different had counsel presented expert medical testimony, as evidence of defendant's guilt, including his own testimony describing severity of his beating of victim, was overwhelming); *People v. Randall*, 2016 IL App (1st) 143371, ¶ 62 (finding that counsel's decision to open door to introduction of other-crimes evidence did not prejudice defendant, as there was overwhelming evidence that he shot two people, including his own testimony admitting he shot them).

¶ 42     A defendant claiming ineffective assistance of counsel based on his trial counsel's failure to object to hearsay cannot establish the prejudice prong of the *Strickland* test if the admissible evidence against the defendant is overwhelming. See, *e.g.*, *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 41, 44; see also *People v. Torres*, 18 Ill. App. 3d 921, 929 (1974) ("Even if hearsay testimony is improperly admitted, reversal is not warranted where the same matter has been proved by properly admitted evidence."). Here, where overwhelming admissible evidence established that

defendant used deadly force in self-defense, but his belief in the need to do so was unreasonable, we cannot find that defendant was prejudiced by his trial counsel's failure to object to Felicia's statements to the police on hearsay grounds.

¶ 43    Stated differently, defendant has not shown that, absent Felicia's statements, a reasonable probability exists that the trial court would have acquitted him. See *People v. Martin*, 408 Ill. App. 3d 44, 52 (2011) ("Because [defendant] has not established a reasonable probability that he would have achieved a better result if defense counsel had not erred, [defendant] has not shown that he received ineffective assistance of counsel."). As defendant cannot establish prejudice, his claim of ineffectiveness fails.

¶ 44    For the reasons explained above, we affirm the judgment of the trial court.

¶ 45    Affirmed.